The first case, Town of South Hold v. Wheeler May it please the Court, Counsel, Scott Kreppen with David Spellman Barrett for the appellant Town of South Hold. I would like to begin where the EPA's analysis left off, and that really is identified at page 2949 and forward of the record. The material that will be disposed at this proposed site, the portion of it that doesn't sink down directly to the bottom, will proceed in a plume that will engulf a protected habitat in the Town of South Hold, the island of Fishers Island, which is partially inhabited and also heavily environmentally protected. And you can see in the tracer analysis they did to monitor this plume that it will literally engulf the island. The current will take this material, the most concentrated portion of it, directly to the western shore of the island, which is the most protected point, at a rate that's ten times more concentrated than any other coastline. Now at that point, there is a basis to find that this is inconsistent with South Hold's policies, which have been adopted by both the state and the federal government. But to move further, particularly policy number six, which basically says don't dump near Fishers Island, at least in part, policy number six is specifically addressing dredged material being dumped near Fishers Island, and says no, don't do it. The EPA had a basis there to say no, this site designation is inconsistent with the Town of South Hold's policies, but they didn't do that, and instead they made arguments as to why they did not have to look at the Town of South Hold's policies specifically. Congress gave them five years to do an environmental analysis, and at the end, looking at South Hold occurred, specifically South Hold, not the entire Sound, occurred just with the final rule. At the very end, after, in responding to the state's objections, the, if they were to find that this was consistent, and at that point it should have gone into the mediation process with the involvement of the President. There's an inconsistency and a serious dispute between two states. But to find that this was consistent with the Town of South Hold's policies, they needed to go much, much, much further. This is an enormous record, but nearly all of the record. So what you're saying is that this particular objection or concern about the Town of South Hold was, and the plume analysis was raised so late that it wasn't subject to all the procedural back and forth that had already occurred, and the agency took inadequate account of it in making its consistency determination? Yes. Yes. The agency took the position that they did not need to look at the environmental impact beyond the site itself. They didn't need to look at South Hold. And in particular, they also disagreed with how they would have to take a look at it. The agency... But they did say, didn't they, that an EIS would be prepared, that there were certain objections that were still premature to raise because there's a whole permitting process that was kind of a gateway to those concerns, and that there would be adjustments made in the future. And what was the initial decision here was to reconcile the concerns of the states of Connecticut and New York with regard to going forward with any kind of dredging plan which they had determined was necessary. So you don't think that those would be adequately, or would be addressed in the permitting and the EIS process later on? No. And that approach of deferring until you have these specific projects is inconsistent with the Huntington case. Separately, they need to look at where the material is coming from and where it's going as part of this analysis. You can't separate that from designating the site to how the site is going to be used. In particular, the electric boat application, which is one of the two major federal applications that they knew was in the pipeline, ultimately the district court heavily relied on exactly the argument that you're raising, that there would be a permitting process and you can look at suitability. But when that happened in practice, one, the way they approached suitability was to take portions of samples and exclude the top layer and average it out in a way that the state said no, that's not suitable. It's material from a superfund site. This is at a level of detail that it seems to me is more appropriate maybe for negotiation and consideration at a later stage. Right now we have a fundamental challenge to the basic consistency determination, what the agency's obligation was to have taken into account the New York State plan into which Southhold's concerns were incorporated. So in accordance with the statutory scheme and regulatory scheme, it seems to me that the kind of objections you're raising ought to be able to be adequately addressed, even if not to Southhold's complete satisfaction at a later time. What can you tell me that would convince me that they will not be addressed? Well, two things. One, it's not a matter of just, it needs to be consistent. It's a consistency finding. It's not just considering them. They need to find that it's consistent. Well, the standard is consistent to the maximum extent practicable, and that involves reconciliation of varying considerations and interests, doesn't it? To a very limited degree. The way the regulations interpret maximum extent practicable is consistent. If the EPA is placed in a position of trying to reconcile disagreements between the State of New York and the State of Connecticut, that's not its role. The statute, the CZMA, specifically says in that situation it needs to go to mediation with the Secretary and then go up to the President, and the President can override it. But it's not the EPA's job to say, no, we don't like New York's policy here, but we like Connecticut's policy better. And second, one thing that was just lost in the district court analysis was that these are projects, the known projects, have a component of national interest, where they ended up being the major project that was the biggest concern, where had there been an individualized Eastern Long Island Sound approach where we could have put increased restrictions, even those projects themselves could have been pushed off the continental shelf, those were then later exempt from the suitability analysis based on national security interests. I'm a little confused. You keep referring to the mediation process, but I thought under 930.43d, if there's an objection, but the federal agency concludes that the proposed action is fully consistent with the enforceable policies of the management program, even if there's an objection, it can proceed, right? If they properly conclude that it's fully consistent. Our position here is that they didn't have a basis to find consistency. But in that instance, there's no required, the mediation process is not required under that situation. No. If this site designation was consistent or consistent to the maximum extent practical, then no, but we're challenging that finding. I understand. And if there's nothing further, I'll rest it on briefs other than a rebuttal. Thank you. We'll hear from your colleague. May it please the court, Eric Del Pozo for the State of New York. The grant of summary judgment to defendants should be reversed or vacated. At a bare minimum, it should be vacated because the district court didn't undertake the required analysis of whether EPA site designation was actually in accordance with the CZMA. But it should be reversed under any standard of review because EPA's designation in fact was not in accordance with the CZMA and several of the key premises in EPA's consistency determination were also arbitrary and capricious. Now, when the Department of Commerce approved the state's coastal management... Could I just ask a preliminary question? In your brief, you seem to be taking the position that any plan, dredging plan approved by EPA needed to be fully consistent with the state's management plan. And yet, there's a phrase that it needs to be consistent to the maximum extent practicable, which seems to me something less. And also with the state's enforceable policies and plan. Do you agree that this is not an absolute requirement that the state gets to make about... Or a determination the state gets to make about complete consistency with the state's published plan? So there were several questions in there, Judge Carney, and I'll take them in order. Under NOAA's longstanding interpretation of this statutory phrase, consistent maximum... To the maximum extent practicable is full consistency with the state's enforceable policies unless full consistency is prohibited by other federal laws. So let's say Congress had enacted a law that said EPA must designate a dumping site in the Eastern Sound, then perhaps that would be another federal law that would override the state's plan. But there's no claim that there's such a law here. But let me interrupt for just a minute, though, because as Judge Bianco has just pointed out, the statute and the regulations implemented by NOAA also provide a kind of mechanism for reconciling or at least addressing situations in which states have competing CCM plans, right? Well, the regulation that Judge Bianco cited was 930.43d, which allows the federal agency, if it disagrees with the state's consistency objection, to proceed with the activity upon prior notice to the state. But that doesn't make the federal agency the arbiter of the dispute. NOAA has said in regulatory commentary specifically, which we've cited in our reply brief, that if the state disagrees with that consistency determination, the next step for the state could be litigation in a federal court over whether the activity is actually consistent. On the question of what standard would apply, I'm having a hard time understanding in the sense that EPA does not administer the entire coastal management system, that somehow they should not be entitled to the arbitrary and capricious stand. I understand that it's their decision whether or not it's consistent or not, certainly within their area of expertise. It's a final decision. So explain to me, I know you cite these cases about Chevron deference, but I think it's a different issue. Can you explain that to me? Sure, Judge Bianco. Arbitrary and capricious review is a backstop, an outer boundary for an agency action traditionally taken under a statute which the agency administers. But the EPA's requirement that the agency action also be in accordance with law means any law whatsoever. And here it's important to look at what the CCMA actually requires. But accordance with law is the backstop, the term you use when they don't file a report that they're supposed to file, something that's blatantly contrary to regulation. Here there's a disagreement about the merits of their decision. So this is not in accordance with the law type situation, right? Everything would be, every time you disagree with an agency's decision, you would say, it's not in accordance with the law, so they don't get arbitrary and capricious in it. That's not what we're talking about. Not under a statute the agency administers when the agency hasn't violated any direct statutory command. Then it would be solely deferential rationality review. But what you've said, Judge Bianco, is one way an action can be not in accordance with law. There are many ways. And here, based on indicia of congressional intent, federal agencies have to fully comply with the state management program at the agency level. And then on judicial review, the court has to determine full consistency. I'm having difficulty with this argument, too. It seems like it would unravel entirely the APA. So what am I, what are Judge Bianco and I missing about this? The specific requirements of the CZMA, which control, this wouldn't, this argument wouldn't apply to every statute writ large, no matter the circumstance. You'd have to look at the specific statute and what it requires as authority that we've cited in the past. It's not the best indicator of congressional intent in this regard, is the presidential waiver provision in 1456C1B, which we've cited in our brief, which defendants have not addressed either at all or in any substance, which says that it provides the out for the federal agency. If a federal court finds that the activity is not, in fact, consistent with the state enforceable policies, then the presidential waiver. Your argument is that means they want courts to do de novo review of these very complicated environmental matters in every situation. That's what Congress was thinking when they put that in there? A de novo review of the ultimate. They're taking away the whole structure of the APA and saying, for this particular situation, we want this to be de novo review by courts. Of the ultimate consistency determination, now, if there are subsidiary scientific determinations, there's actually a regulation that covers that, 15 CFR 930.39A, which requires sufficient facts and data to support assertions in the consistency statement. But for the ultimate consistency determination, as here, the review would be de novo. But as we've argued in our brief, we would satisfy even arbitrary and capricious review. And I'll point the Court to a specific regulation. It's 930.32A3, which says that a federal agency cannot rely on a general lack of funding to excuse consistency obligations. So that's a regulatorily barred criterion, which EPA repeatedly relied on here. But are you saying EPA relied heavily on that? There were a lot of other considerations that I thought they took into account. Unlike in the city of Sausalito case, for example, they didn't just say there's no money and so this is where it's going to be. They did a fairly detailed analysis over a long period of time and with a lot of back and forth with the various stakeholders. They did, Judge Kearney, but the references to a lack of funding are, the consistency determination is shot through with references to a lack of funding. EPA actually says, concedes that on page 3077 of the record, that even without a new site designated, some or all of this material could be hauled to the central government. It would be more expensive. They're not precluded from taking expense into account, are they? And not for two otherwise consistent actions under the CZMA. Of course, an agency can pick the less cost we want, but what it cannot do is take an otherwise inconsistent action that would conflict with the state's management program and then say, we're not going to consider that because we think down the line Congress won't provide funding for these activities. In 3245, the appendix, they give their reasons, they say, you know, it would involve, the other options would involve greater energy use, increased air emissions, increased risk of spills, and then they say, and greater cost. That's okay, right? They can't, you know what I'm saying, when they're considering options, you know, it's one thing that Judge Kearney pointed out, to talk about just a general lack of funding and that being your only consideration here in assessing options among many different things they consider, they noted the greater cost. And at the same time, Judge Bianco, EPA has minimized those considerations, saying, albeit in the context of hauling to the eastern site, that the environmental effects wouldn't be that bad because you can't haul during the summer, and you can't haul during turbulent sea conditions, and vessels can't avoid the stows, the very same reasons the ferries have come in and said, we don't object to this site. And so the economic- It's very different than looking at your cost objection to cost that, to a lack of funding on the agency's part, we don't have the money to do this, and references to cost, private dredgers may find it too expensive to reach the site, and so certain dredging activity operations might not be able to go forward. Well, the regulation applies only to federal agency costs, Judge Livingston, that's right, and two-thirds of the dredging that will occur in this 30-year timeline will be federal. It would not apply to private projects, which have their own potential issues, which we've cited in a recent- So to the extent when we review the record and we see cost, references to cost that are not as specific to the agency, we need not be bothered by those. I think you should be bothered by those because the references to cost come in direct context of talking about cost to the public, EPA uses that word, cost to taxpayers, and a Navy dredging project, which is a federal project. Now, EPA could have designated a site solely for private projects, New York would have objected probably on some of these same grounds, but it wouldn't have this same infirmity. Judge Kearney, to get back to the third question that you asked, the enforceability of New York's policies is not in dispute here. NOAA has approved them, so they're sufficiently specific for this purpose, and to the extent that Judge Perlman seemed to question whether New York's policies were specific enough to be enforceable, that merely amplifies the error in Judge Perlman's analysis and his failure to conduct the proper analysis. The idea that the policies which are NOAA approved and need not be so specific on their face that a federal agency activity would conflict with the literal text, that would be a misapprehension that would have colored, perhaps, Judge Perlman's mistaken view of this entire claim. Thank you. Thank you. Good morning, Your Honors. Sean Green Delgado, Assistant U.S. Attorney for the Eastern District of New York. May I please report? The issue raised in this APA litigation is a straightforward one. Whether EPA's decision to designate the Eastern Long Island Disposal Site for potential future disposal was reasonable and reasonably explained. And with respect to this appeal, in which plaintiffs have abandoned all claims under the Impreza, the issue is even narrower. Whether EPA's consistency determination under the CZMA followed applicable law and was supported by the record. As EPA demonstrated in its brief, the answer to that question is clearly yes. The touchstone in any APA record review is the record itself. That is to say, the question for the Court is whether the federal agency's decision finds support in the administrative record. As this Court has held, all that is required to uphold agency action under the APA is that there is a rational connection between the facts found and the choice made. Or as the Supreme Court held last year in DHS v. Regents, the Court's narrow review assesses only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. And even more recently, as the Court succinctly put it this year in Prometheus Radio, a court simply ensures that the agency has acted within a zone of reasonableness. This is the long-established review regime for agency action under the APA. And therefore, New York's argument that some other standards should apply is without merit. The State attempts to escape this reality by arguing that the CZMA somehow alters the standard of review, such that State Farm or standard arbitrary and capricious APA review does not apply. But this Court's precedents make clear that State Farm standard governs review of agency action generally and is appropriate on review of noninterpretive agency rulemaking. Could you help me understand the point that your adversary is making about the role of the President in resolving and in mediation, what Congress contemplated in the statute? At what point is that process properly invoked? And they're suggesting that it's this kind of dispute between States that ought to lead to the mediation process and the agency wasn't authorized to resolve basically to plans that determined to have some inconsistencies as I understand it. So with respect to the presidential waiver provision, that's based on a determination already that there was, that EPA was claiming that it couldn't be consistent, that it's on remand and there has to be a process by which that inconsistency gets worked out. EPA is not claiming here that it was inconsistent. In fact, we say multiple times throughout our brief, seven times in fact, that we were fully consistent and that statement is supported by the record. So the State's view that it is inconsistent is not worthy of consideration? The State's view is not what controls under APA arbitrary and capricious State Farm review. Well, I think their argument is the standard is arbitrary, capricious, abuse of discretion or otherwise not in accordance with law. And this consistency determination is not in accordance with law because it's legally incorrect. Your Honor, we have a specific argument in the brief for why it's not in accordance with law. Part of the APA doesn't help plaintiffs here because with respect to each of their arguments, APA in fact considered all of the objections made and with respect to specifically the lack of funding and the specificity of regulations, EPA has responded throughout the administrative process and has made clear that they didn't rely on any lack of funding, on any lack of federal funding, which is the important part here. They weren't relying on the fact that they didn't account for this in their budgetary processes, the cost of compliance with the State's CMP. Rather, they were using that consideration as part of the NEPA alternatives analysis, which is perfectly appropriate under the NPRSA and, in fact, requires it. Can I just ask you, the presidential waiver provision, I think their argument is because of the way it's worded, it's overriding the normal APA standard because it says the President may appoint written requests from the Secretary exempt from compliance, those elements of inconsistent with an approved State program, that language found by the federal court to be inconsistent, they're saying, suggests de novo review. It doesn't have any type of deferential, it suggests that the court makes that determination de novo. What's your response to that? Your Honor, it would simply be that what's stated in that regulation does not control the court's standard of review here. What controls the court's standard of review is the APA itself, as well as the State. Congress could change the standard in a particular situation, that's what they're arguing, that that statute changed the standard of review. It has never been held by any court. In fact, this court itself in George v. Evans applied this State Farm Arbitrary Increases Review in deciding that case under the CCMA. The Third Circuit and the Ninth Circuit agreed and applied the same standard. In fact, there is no basis in law for what New York argues here, that the standards should somehow change just because the CCMA is at issue. And that's … They spent a lot of time in their reply brief on a D.C. Circuit case, Scheduled Airlines. Do you think that case was wrong or is it distinguishable? It's distinguishable, Your Honor. And that's because Scheduled Airlines had to do with an interpretation that was subject to Chevron. The question was whether the interpretation by the Department of Defense was entitled to Chevron deference. Here, there is no issue of Chevron deference. The State's argument that EPA should not receive deference because it does not administer the statute is really a non sequitur, right? The EPA does not administer the CCMA, and therefore Chevron deference doesn't apply. So the EPA's consistency determination was not an interpretation of the statute. It was an application of the statute? That's correct, Your Honor. EPA's determination, its consistency determination, was a judgment reached by the agency that was reasonable based on the evidence in the record. That's not a legal interpretation within the context of Chevron, a Chevron analysis. And that's reflected by the extensive factual record that had to be developed in order for the statutory language to be applied, I take it? That's precisely so, Your Honor. Yes. So I did briefly want to address a couple of points that were raised by Southhold. First, they argued that the EPA failed to consider that the material that's disposed of at the site will plume. That's simply not true. It's not supported by the record. In fact, EPA emphasized throughout the rulemaking process that the portion of the NLDS, New London Disposal Site, as well as the NLWA and the NLWB, those more westerly portions, were in fact a containment site. And that's pointed out by the district court in its decision, and that was entirely correct. And furthermore, Southhold waived this point because it wasn't raised below. So as to Policy 6, which they cite for the proposition that it says don't dump near Fishers Island, that's also not true. It's not in the record. And in any event, EPA also moved its site farther from Fishers Island in response to New York's comments. So there's no support for the proposition that this was not examined fully by EPA, it took into account the considerations, and reached a rational decision. And then with respect to Huntington, which Southhold claims the designation is inconsistent with, the issue there was segmentation. But it was not the segmentation, or rather Southhold's segmentation argument here is not what  if it wasn't waived, Huntington is the opposite because it's in the context of a core site selection, a U.S. Army Corps site selection, where the permits were already applied for. And here, this is a site designation by the EPA where there were no pending permit applications. So that segmentation argument doesn't apply. And the court was absolutely right earlier this morning in noting that any concerns regarding the traditional segmentation analysis of larger projects being broken down into smaller ones, or what counsel is arguing here, will be addressed in the permitting process. And in any event, the permitting process includes a rigorous review by the Army Corps applying CWA, or Clean Water Act, standards. And so the idea that this will be a free pass for people to come and dispose at the ELDS just has no basis either in the record or really in common sense because the review regime across the Sound is the most rigorous of any inland body of water in the country. So that larger projects and non-federal projects will be reviewed under the NPRSA, and smaller projects and federal projects will be reviewed under the CWA.  Thank you, Your Honor. May it please the Court, Assistant Attorney General Robert Smith for the Connecticut Department of Energy and Environmental Protection. New York's position on the standard of review is actually not the law of the Coastal Zone Management Act. It seems to conflate, at least to our perspective, the substantive review under the CCMA done by agencies and the procedural standard of review under the APA. And ultimately, that's unworkable. Congress knows how to write a law in Section 1456C1 and C3. I'm sorry, could you speak up a little bit? I'm having a little trouble hearing. Sorry. Thank you. Congress knows how to write a law, and there are two separate treatments under the Coastal Zone Management Act in dealing with the denial of consistency. If you're a private party, say a marina or something like that, if New York denies consistency, then you have to go to Commerce. If it's a federal action, then it's reviewed by the agency under the APA under the Arbitrary Income Procedures that are not otherwise in accordance with law. It is our position that they're not otherwise in accordance with law as dealing with what Judge Bianco was talking about when there's a flat-out violation, if they didn't file an EIS under NEPA or something like that. Scheduled Airlines is interesting in that regard because the statute that they were two statutes they were dealing with, what they were dealing with there is a law which requires that all funds received by the federal government go to the public treasurer. Evidently, the authorities at that particular, I think it was an Air Force base, were taking private travel money and putting it into the base, basically it was being used as their sort of recreation fund. So it was a flat violation of law. So that would certainly be not in accordance with law. But there's nothing in the CCMA that creates a different standard of review than would be under the APA. There are two other points that Connecticut would like to make. Connecticut did not file an amicus brief. We intervened from day one. We've been part of, our technical agency has been part of this for nine years. The list of reports in the administrative record runs for 122 pages, 22 volumes of studies. This is the most heavily studied and reviewed analysis I have ever seen in my years of practice in environment and energy law. And it was done in a thorough and searching way with both states and the EPA and the Army Corps. The idea that there are, as Newark suggests, toxics, for example, quote, unquote, laden with toxics, that's pages 56 and 57 of the brief. It's a red herring because under the present, under federal law, as the judge found below, you cannot simply release toxic material. It cannot be disposed of. It is taken and put in lined landfills on land. It simply doesn't go there. So the idea that there's going to be deadly toxins floating around in the sound, a sound which the state of Connecticut has invested huge amounts of money under our Clean Water Act and under our CZMP to preserve is simply not true. There's the other issue of costs. And Connecticut has two responses to this. The first response is that we have private marinas that cannot afford to take material and move it 60 or 100 miles down the sound to other sites. These marinas will close simply if we don't have the eastern site. The other is that cost actually is not just money, and it's not just even the state money or the federal money. There are public health costs.  As we point out in our brief, Connecticut has been nonattainment with the Clean Air Act since 1972, since the day the act was signed. We have NOx emissions. We have ozone emissions. We have right along the southern coast, which impact, as we've noted before, our environmental justice communities in Bridgeport, in New London, and elsewhere. Having diesel tugs haul scowls 120 miles on a round trip, perhaps thousands, hundreds of barges over however many years, is going to have direct impacts to the people of the state of Connecticut who live in areas which are nonattainment on the Clean Air Act. Those are costs that are direct to us, and this really brings down the last point. The consequences to New York from losing the eastern site, as far as I can tell, are nonexistent. The consequences to Connecticut are very real. As the amicus brief filed by the Harbor Management Association points out, there are hundreds of millions of dollars in gross domestic project, loss of not only recreational but also our offshore wind port in New London. If we can't dredge it, we can't do this. We can't meet our obligations under our Clean Air Act, and we'll have direct and consequential actions to small private marinas as well as to the overall economy of eastern Connecticut. There are projects that won't happen if we don't have this site, and that's exactly why I was sent down here to argue this, and that's why we have been so active in this case all along. Ultimately, EPA has done an incredible job over close to a decade in reviewing these many, many reports. They have a detailed analysis fully supported by the law, and we support their position, particularly on the standard of reuse law. Are there any further questions? Thank you. We'll hear rebuttal. Thank you, Your Honor. The accordance of law standard is what was used in the town of Huntington case, and we have with the town of South Hold local waterfront revitalization plan, there's both substantive provisions and procedural protections. They had to take a hard look at the impact on the town of South Hold before taking this action, and the EPA did not do that. Council mentioned there's hundreds of reports, there's tens of thousands of pages of record, but the town of South Hold was barely mentioned, even though this clearly impacts our environment and our ecosystems. So we were accused, but one of the main arguments in response by the EPA was that in attempting to provide some basic background information about the chain of islands where this plume of material, which exists, it's part of their record, calling it a containment site doesn't change the fact that the fine gray material is going to be pushed with the current. But to get some basic background information on the bird sanctuaries and animal habitats on these islands that are in the wake of this plume of material, the EPA claimed that was outside of this enormous, voluminous record. Understandably, the state of Connecticut has a strong economic interest here, and that has been thoroughly, thoroughly looked at, and they've identified a need for a site to dispose of dredged materials. But before designating that site, the EPA was required by law, by the CZMA, to consider the town of South Hold's local waterfront revitalization plan, and they did not do that here. They did not take that hard look. So there was an error in law by not engaging in the required analysis. Thank you. I'd like to make four points very briefly, if I could. The first is that neither EPA nor Connecticut has argued that EPA's consistency determination was actually accorded with New York's coastal policies, so that argument is clearly forfeited. Number two, neither of Pelley's has offered a meaningful response to the presidential waiver provision's plain text, which contemplates that a federal court will determine whether an agency's proposed activity is, in fact, inconsistent. This does change the standard of review, in this case, to the extent the court thinks it might have been more deferential. The court cannot presume that Congress would have given the president nothing to do in that provision. Number three, in response to the argument that toxic material can't or won't be dumped in the sound at an NPRSA-designated site, EPA made that an express premise of its consistency response, and you cited those pages in our brief. Well, in an agency proceeding, it's cited on page 33, footnote 11 of our reply brief, a proposed private dumping project out of Norval Cove, both EPA and Connecticut have taken the opposite position and have said that this number can dump toxic materials in the sound, so long as it's capped with cleaner material under the Clean Water Act, and that directly contradicts what EPA said in its consistency objection. It makes it arbitrary and capricious for that reason alone. And number four, New York is not denigrating Connecticut's interests nor seeking some special preference. It's simply seeking the co-equal status with the federal agency and with the other affected states that the CZMA entitles New York. And unless the Court has any other questions, I'm pressed on. Thank you. Thank you all. We'll take the matter under advisement. Nicely argued.